## KRIPPENDORF v. HYDE and others.

*(Circuit Court, D. Indiana. October 4, 1886.)*

1. FRAUDULENT CONVEYANCES—PREFERENCE—GIVING A FALSE CREDIT—"BOOMING" AN INSOLVENT CONCERN.

   If a creditor of a commercial firm, whose insolvency is known to him but not to the public, helps the firm to keep going, and to extend largely the scope of its business and credit, under a promise of preference over other creditors in case of disaster, which under the circumstances is clearly probable, and the firm, having obtained large quantities of goods on credit, turns them over to this creditor in payment of his demands, keeping nothing for other creditors, the transfer of the goods will be deemed fraudulent.

2. SAME—PREFERENCE UNLAWFUL.

   Upon the facts of the case, *held*, that the preference given was unlawful.

In Chancery.

*D. V. Burns* and *Rankin D. Jones*, for complainant.

*A. W. Hatch* and *Lew Wallace*, for defendants.

Woods, J. The chief question here is whether or not Krippendorf's purchase of certain goods of Frey & Maag was made in good faith on his part. He claims to have taken the goods in payment of demands to the amount of $22,000 which he held against Frey & Magg for moneys loaned and other considerations. The goods consisted of two stocks of shoes,—one at Indianapolis and the other at Chicago. At or near the time when these were delivered to Krippendorf a third stock, at Fort Wayne, was turned over to a Mrs. Chase, in discharge of an indebtedness of Frey & Maag to her, and Maag also conveyed away certain real estate, neither he nor Frey retaining any property subject to execution. The respondents at once instituted a suit in attachment in this court against Frey & Maag, and caused the goods at Indianapolis to be seized, the alleged cause for attachment being that the defendants had disposed of their property with intent to defraud their creditors. On the final hearing the attachment was sustained, and the goods ordered to be sold to satisfy the demands of the plaintiffs, (respondents here,) amounting in the aggregate to the sum of $21,947.60. In order to retain possession of the goods pending the attachment suit, Krippendorf gave the statutory delivery bond, and, after the determination of the suit, in lieu of the goods, brought the appraised value thereof into court, and filed a petition or ancillary bill, (see *Krippendorf* v. *Hyde,* 110 U. S. 276; S. C. 4 Sup. Ct. Rep. 27,) claiming the money as his own, on the ground that he had bought the goods for value, and without notice of the fraudulent intent of Frey & Maag. This claim the master has sustained, and, in addition, has reported that the respondents were themselves censurable for having given credit to Frey & Maag.

A careful study of the evidence has led me to the conclusion that this report ought not to be confirmed.

I do not deem it necessary to consider whether or not the judgment in the principal case establishes, for the purposes of this procedure, the fraudulent intent of Frey & Maag; because if it be conceded that, as against Krippendorf, it is now essential to the case of the respondents that, in addition to the general charge of fraudulent intent contained in the affidavit for attachment, the sale to Krippendorf should be shown to have been fraudulent on their part, the evidence leaves no room for doubt of the fact, and, with hardly less certainty, in my judgment, excludes every reasonable pretense that Krippendorf purchased in good faith, and in ignorance of the fraud of the sellers.

The evidence discloses many circumstances, the details of which need not be stated here, which excite grave suspicion of the truth of the transactions between Frey & Maag, and between them and Krippendorf, as explained by them and by him; but if it be conceded, as asserted, that, in 1881, Krippendorf gave Maag credit for $4,300 worth of shoes, sold for the use of Frey; and that he indorsed for Frey, first in the sum of $2,000, and, again, for $5,000, and after-

wards assumed and paid both debts, and that, about the first of September, Maag went into partnership with Frey in the tobacco business at Cincinnati, (a business which, having continually absorbed large sums, had yielded no returns, and by April, 1882, had been practically abandoned as worthless;) and that in January, 1882, Maag admitted Frey into the shoe business at Indianapolis, (giving him an equal interest in property worth six or eight thousand dollars, for which, if their testimony is to be credited, Frey paid and promised to pay nothing;) and if it be further granted that these separate individual liabilities (Frey's for $7,000 and Maag's for $4,300) were assumed by the firm upon such an agreement and consideration as made them partnership obligations as against any who thereafter should give credit to the firm in the due course of business,—it remains true—indeed, the facts assumed make it true—that Frey & Maag, in the beginning, not to mention their tobacco liabilities, of which Krippendorf could hardly have been entirely ignorant, were indebted to Krippendorf alone in a sum greater by three or four thousand dollars than the value of all they owned, both in partnership and individually, and in this situation were proposing to push, or, as Krippendorf has expressed it, "*to boom,*" a scheme of business which, by the very terms of the agreement for starting it, was made insolvent, and unworthy of that commercial credit which was essential to its prosecution.   It is therefore not to be supposed that Frey & Maag, or Krippendorf, believed it reasonably possible for them to conduct their enterprise upon a considerable scale with advantage. to themselves, or with safety to him, as their "confidential creditor," without a strong probability—they could not well have deemed it less than a certainty—of inflicting losses upon others of whom they should obtain credit.

It was in this condition of their affairs, the essential facts of which, it cannot be doubted, he well understood, that, instead of demanding security for or payment of the large amount already due him, and instead of supplying them with goods of his own firm's manufacture, Krippendorf, besides indorsing for $3,000 at Chicago, consented to advance to Frey & Maag such sums of money as they should need between April and September, 1882; they promising that the proceeds of sales meantime should be paid to him, and that, if they became embarrassed, they would pay him in preference to other creditors.   In his last examination Krippendorf denies any recollection of this promise for a preference, though by his testimony in the attachment case he seems to have admitted the fact.   But whatever the primary understanding between them was, it is claimed that loans were made prior to September 20th, when the sale of goods in question took place, to the amount of $13,500 or more, and in excess of repayments to the amount of $11,000; making his entire demand at that time, aside from the Chicago indorsement, about $22,000, in payment of which the goods in the stores at.

Indianapolis and Chicago were sold and turned over to him. It is to be noted that no appraisement was had, and that, without seeing the goods, Krippendorf agreed, upon the statements of Frey & Maag, to take them in full discharge of his demand. It appears, too, that these loans of money were made in most instances, if not always, by check or draft, sent by mail from Cincinnati, where Krippendorf resided, to Indianapolis; and it is shown that notes, checks, and drafts were frequently sent in that way by him to them, and by them to him, during the period of the transactions in question; and yet not a letter or line of correspondence, though called for, is in evidence. Krippendorf's testimony is that there was no correspondence; his explanation being that none was necessary, because of Frey's frequent visits to him at Cincinnati. Maag, I believe, says he did not preserve letters.

It is impossible to believe that all these checks and drafts, covering large sums of money, went by mail, unaccompanied by any communication or statement which, if produced, would show the real character and purpose of the several transactions; and for this and other reasons there must arise doubts on the subject of which the respondents may fairly claim the benefit. But waiving this consideration, and conceding the facts in this respect to be as alleged, the merits of the case are not essentially different; because if Krippendorf gave credit to Frey & Maag, as asserted, he did it under circumstances which compel an inference of bad faith, or conscious disregard on his part of the rights of others, which, under the circumstances, he was bound to respect.

It is a familiar and salutary rule which holds men responsib e for the natural and reasonable consequences of their acts and conduct as if the particular consequences which do follow had been intended; and that Frey & Maag and Krippendorf must all have known that the proposed scheme of business necessarily involved heavy purchases on credit, when credit was not merited, and could not be had of prudent merchants possessed of knowledge of the facts, is quite apparent; and that by making these loans he was contributing directly to the establishment and maintenance of this credit Krippendorf must have understood. The loans were asked, as he himself has testified, for the purpose of paying mercantile bills, and correspond quite nearly in amount with the aggregate of the sums paid upon such demands by Frey & Maag during the period in which the loans were made, and during which the respondents gave to Frey & Maag credit for goods. This fact, however, does not necessarily corroborate the testimony that the loans were made to the extent stated, because there is wanting a satisfactory account of the amount and disposition of the proceeds of sales made during the time the business had been going.

I do not doubt, as in *Smith* v. *Craft*, 17 Fed. Rep. 705, I held, that a preference of one creditor over others is not invalid because given

in pursuance of an agreement therefor made when the credit was given, if the agreement be made under circumstances consistent with good faith; and so, too, as I had occasion to say in *Lippincott v. Shaw Carriage Co.*, 25 Fed. Rep. 590, one may give aid and credit to an embarrassed person, firm, or company, for the honest purpose of helping over difficulties *reasonably supposed to be not insuperable*, and yet be entitled, in case of disaster, to receive a preference in respect to the credit so extended. But this plainly was not such a case. On the contrary, Krippendorf, when, by his indorsement at Chicago, he added to the debt without corresponding increase of the assets of an already insolvent firm, and thereby placed its business upon an enlarged plan, which at once required, and to the commercial world seemed to justify, heavier purchases than would otherwise have been necessary, and when in April he made the first loan of money to Frey & Maag, could not reasonably have anticipated an honest and successful outcome of the scheme which he then undertook to assist; and clear as the probability—not to say certainty—of failure was in the beginning, it became more and more evident with each successive call upon him for additional aid. Recognizing that he was not blameless in this respect, the master has reported "that the conduct of Krippendorf was not as prudent as it should have been," and counsel have suggested that this alone is enough to require a reversal of the master's finding. But, be that as it may, I am of opinion, without going further into details of the evidence, that Krippendorf's conduct was so far implicated with that of Frey & Maag in the project and prosecution of their business, that by means of his frequent interviews with Frey, who was his brother-in-law, and otherwise, he was all the time possessed of such intimate knowledge of their affairs, prospects, and purposes, and that he had of them such secret and confidential assurances of protection in respect to his own demands, as to discredit the assertion of good faith and innocence on his part. As against the respondents a gross fraud was designed and executed, of which, to all appearance, he was the principal and final beneficiary; and to permit him to retain his ill-gotten advantage, besides lending judicial sanction to the particular transaction, would tend to establish a pernicious and dangerous precedent, inconsistent with the good faith and confidence which are essential to the right conduct of commercial affairs.

But, according to the report—

"It may also be said that the eastern creditors of the firm were equally foolish. Frey & Maag were under suspicion all the time by such of the eastern creditors as have given testimony in this case. They were plied with questions at Indianapolis and in Boston as to their standing, and treated as if they were under suspicion. It might fairly be said that the merchants—the jobbers and manufacturers in the East—who sold Frey & Maag so many goods on credit did as much to give them their commercial standing as Mr. Krippendorf, who was quietly advancing them money. It would be very natural for merchants in Boston, or manufacturers and jobbers in Boston and New

York, who saw reputable business houses selling goods without reservation to Frey & Maag, to suppose that they were abundantly able to carry on their business successfully, and pay their creditors."

On this view, if it be a fair one, there ought to be discrimination in respect to those merchants, not overturning in the same boat the innocent and the guilty. But the propositions quoted do not, I think, present a logical or just view of the case. The right to give credit in commercial transactions is sanctioned by both law and custom; and, if business is not to degenerate into robbery, the basis of credit must be the honesty and good faith of dealers. For the upbuilding of false and undeserved credit, just blame can attach only to those who knowingly, or with culpable carelessness, in some way aid the imposture. Whatever were the reasons upon which they acted at the time, it is now certain that the respondents did no injustice to Frey & Maag by suspecting their trustworthiness, and by plying them with questions. Neither did they part with their goods to them until their suspicions were overcome by false representations of fact, made potent and effective, as may well be inferred, by the prompt payments which Frey & Maag were wont to make of bills for earlier purchases, which, if their own testimony be accepted, they could not have met so promptly but for Krippendorf's opportune loans; and these, as we have seen, he made with knowledge, or under circumstances equivalent to knowledge, on his part, that he was aiding a failing business, whose losses to a large extent he must finally bear, unless, according to the assurance given him in the beginning, they could be shifted to other shoulders.

It may be true, as the report says, that Krippendorf was "busy with his own affairs;" but it belonged to his own affairs to know into whose hands he was intrusting nearly one-third of his considerable fortune, and it is not to be believed that he acted in so important a matter with a careless, but innocent, inattention; especially after the warning which came from the refusal of his own business partner to share in the risk of extending time on a credit theretofore given to Maag, or to him and Frey, when comparatively a small sum only was involved. It may be, too, that Krippendorf did not know "the extent of Frey & Maag's misfortunes in the tobacco business," nor "the extent to which they were buying goods on credit;" but he was cognizant of quite enough of these matters to have awakened to distrust and inquiry any one who was both prudent and honest, and consequently enough, notwithstanding "the *lavish* manner in which he gave them his money and the credit of his name," to cast discredit on his assertion of "faith in the ability of both Frey and Maag as business men." If it can be believed that he looked for a successful outcome of their business, or had any faith in them, beyond a reliance on their promised fidelity to him, it was an excuseless trust against which his own intelligence ought to have warned him at every step. He cannot, therefore, be permitted to divert the consequences from himself to others whom his conduct

has contributed so directly to injure, whether the part which he played was one of perfidy or folly.

The bill is without equity, and should be dismissed. So ordered.